All right. Can the attorneys on Pitman approach the podium and identify yourselves for the record, please? Hello. My name is Deepa Punjabi. I represent the defendant Appellant Denzel Pitman. Good morning, Your Honor. This is Assistant State's Attorney Brian Levitsky on behalf of the people of the State of Illinois. All right. Ms. Punjabi, did you want to reserve some time for rebuttal? Yes, please. How much? We normally do 15 minutes per side, so of that 15 minutes, how much would you like to reserve? I would say three or four minutes. Great. All right. Thank you. Ms. Punjabi, you can proceed. Thank you. As this Court is aware, there has been a clear trend in the jurisprudence of this country and in the State of Illinois towards more leniency and sentencing discretion in cases involving young offenders based on an emerging awareness and consensus within our society about the potential lessened moral culpability and higher rehabilitative capacity of youthful offenders. In this case, Denzel Pitman was found guilty of multiple murders, and as such, she was subject to a natural life in prison without parole, with no opportunity for the judge to make any sort of individualized sentencing determination. And around the time of the offense, Denzel was 18 years old. He had had a troubled and violent upbringing. There are some indications of the onset of a serious mental illness around this time. And, of course, the sentencing court had no opportunity to consider these youth-related factors when imposing the sentence. Would you speak up a little louder? I don't know if the other attorneys and parties that are here can hear you. Yeah, I can hardly hear. Oh, I apologize. These aren't microphones. They're just recording devices. So just keep your voice down as loud as you can. Yeah, you've got to speak up a little louder. Sure. I apologize. This mandatory sentencing scheme is cruel and unusual as applied to Denzel and shocks the moral sense of our community in light of our evolving societal standards of fairness and decency. First, Denzel's sentence does not pass constitutional muster under the Eighth Amendment. And I'm aware that this court has held, has not entertained these challenges for those that are Has any court? Well, I'm not sure. Well, this court, I think two of us sitting up here, at least on one case, House, we did hold that an as-applied challenge would lie in that particular case based on the particular facts of that particular case. Yes. And then we had, I think three of us were on a subsequent case, and the name of it escaped me just momentarily, but there were three deaths involved. Remember which one I'm talking about? Was it Ybarra? Yes. Yes. It was Ybarra. And we distinguished Ybarra based on a number of things, but primarily because in the House case there was a convergence of an accountability statute and he was, well, he had just turned 19. And we also pointed out that in that case he was, he was not the shooter. He was actually held accountable. And then we had Ybarra. And that case involved two victims, but this case involves three. And Ybarra involved three. Yes, that's true. And I apologize. We feel that they're all reconcilable. That all three of these cases are? Yes. Especially since I, I mean, I wrote at least the two, and now we have a third case. Sure. And Justice Burke, I thought your question pertained specifically to Eighth Amendment challenges. Certainly in House the defendant's sentencing challenge was upheld under the You know, in, in Ybarra, that's true that the person was the principal shooter and in House the defendant was convicted on a theory of accountability. And here, of course, Denzel was the principal and only offender. But in, in People v. Harris, this court struck down a 19-year-old defendant's mandatory de facto naturalized sentence under the Illinois Proportionate Penalties Clause. And there, the defendant was the principal shooter. And it was another division. That's true. And the case is actually pending in front of the Illinois Supreme Court. Yes, that is correct. It is pending. But, you know, like Denzel Pittman, Darian Harris had no prior criminal history. And Ybarra, this division's case in Ybarra, I would argue, was distinguishable in that, you know, there, there was some evidence that there had been some planning beforehand. I believe the defendant had asked his sister to put his gun aside, that there was careful planning and premeditation in that case, whereas this appears to be more a crime of passion in the moment by someone who is in the thrones of the onset of a mental illness. I mean, a few months after this case, while he was in custody for this offense, he was diagnosed with bipolar disorder. And he had reported hearing voices that gave violent demands that he would try to ignore. He survived a BCX, though. He was found fit for sentencing. Isn't that correct? That's correct. So after the onset of this mental illness, he was still subject to a stringent mental examination. And they found that he was sufficiently capable of being sentenced. Correct? That's correct. That was, the BCX was for fitness at sentencing, I believe. And he, you know, at that point, he had been on medication. He had, prior to this, he had not been treated for this mental illness. Was the defense of insanity ever raised? No, it was not. But he had, he had not been, and, and this is one thing that the court maybe should have been able to look at in sentencing him, that now that he's getting some mental health issues, maybe that increases his rehabilitative potential. He had a lot, there were a lot of factors here that were the very factors that Miller concerned itself with, and insisted that a court must account for when imposing a life sentence on a youthful offender. Here... And the court also considered, didn't he stab this Hannigan, those 19 times? Yes, he did. 29 times? Yes, he did. And how many for the 11-year-old sister? I believe it was 12 times. It's, there's no doubt, this was a very... And this is a horrific case. Yes, Your Honor. It was a horrific case, but this court noted in Romar-Gibson, again, I know that was a different division... But they were generally allowed as well. I think that appeal was dismissed in the Supreme Court. Gibson? I believe so. The Supreme Court said it was a... I don't... I thought, maybe I thought, I could be wrong. I thought that was appeal pending. It was pending, and then I thought perhaps it had been dismissed that appeal was no longer pending. But so, you know, in Romar-Gibson, this court noted that even heinous crimes don't necessarily mean that a young person is irretrievably depraved. And in that case, you know, that case had some similarities to this one in wherein you had a young person with some mental illness, which the court noted. And obviously that could have increased impulsivity, volatility, impaired the ability to make judgments. Also, that was also another case where the offense appeared to be the result of rash and impulsive behavior. Didn't he give an indication, though, to someone at the jail about how and why he did this? He did. According to Thomas Johnson, the jailhouse informant, he said that this... basically that, again, that this was a crime of passion, that he had found out that his girlfriend had been seeing other people and that this had enraged him. Was that the defense? Was there some sort of... Trying to get it down to a second degree or... No, I don't think the defense presented that. So the crime of passion... Let's stick with that for a minute. So we have a crime of passion with him and the girlfriend. He found out the girlfriend was cheating on him, and the crime of passion occurs then. He then goes into the apartment and finds the mother who's lame. She has crutches. She can't move away from him, and he stabs her repeatedly. And then he chases down the 11-year-old sister, and he stabs her repeatedly. How is that the crime of passion? And he specifically said he killed the 11-year-old because he didn't want any witnesses. That's not a crime of passion at that point. At that point, it's a murderer covering up his tracks. Yes, I understand your point, Your Honor. I did defense. I know how hard this is, and this is a horrific, horrific crime. And that's what you're charged with is trying to find a defense for him. But the Eighth Amendment has been ruled repeatedly again and again and again that he's 18. You cannot use that argument that a juvenile can't be sentenced this way. So I'm not sure if you never raised the issue that he's mentally ill as a defense. How can we address it now? Well, you know, the rehabilitation portion of the Illinois Proportionate Penalties Clause, anyway, it means that in addition to... Where is there any rehabilitation potential here? Where? This was, I think, the precedent we've seen on this teaches that his aging itself means that there's the very nature of his still-developing mind means that there's greater prospects for reform, that the person he is now may be a different person 10 years from now. This is also a person with no prior criminal offenses. Again, whereas before he had not been receiving treatment for any of these mental health issues, by the time he was sentenced, he had been getting some consistent treatment. All of these things could have meant greater rehabilitative capacity. He said that he was getting a three-sentence investigation. That he was getting mental health treatment and that he was on medication? I believe so. And then I think it also came out at the BCX. Isn't this kind of a legislative function? I mean, aren't there things that could be done to address these kinds of matters in the legislature? That if, you know, a youthful offender should be considered someone under the age of 21 or even 25. But aren't they really legislative matters at this point? There are certain things the legislature can and I would argue should do. But, you know, sometimes the judiciary is ahead of the legislature. In Leon Miller, the Supreme Court invalidated a legislatively mandated life sentence for a 15-year-old. But in doing so, it rejected the notion that his hands were tied by the legislature. The Leon Miller decision made clear that judges have a duty to review challenges to the legislature's sentencing schemes to ensure that they comply with constitutional directives. And it may fall on the judiciary to say, to take the lead in saying, look, we have review claims of constitutional proportionality through our evolving social norms. And we have an emerging consensus on the ongoing neurological development of young adults that is changing our notions of fairness and decency when sentencing young adult offenders. And, you know, that's the... Shouldn't every single case be decided on its individual merits? I certainly, I would argue that when you have... A mandatory sentence. Yes, the harshest sentence available. I would argue that... And perhaps Leon Miller... That's kind of already contested because there are cases that say that the legislature can choose to say, without violating any constitutional provision, that if you kill more than one person and you're over 18... I mean, they have long held in this state the difference between someone killed... We don't have capital punishment anymore. But when we did, you had to be over 18. And one of the provisions allowed for the imposition of that severe, severe penalty, which we don't have anymore. But the language of our statute still allows a mandatory life sentence or a life sentence when you kill more than one person. And it also allows for this severe sentence of life when you kill someone who's under 12. This was a little child who was 11 years old. Now, you can argue that certainly there's mitigation here. But to the family members, it's really hard to tell them that the legislature doesn't have the power to say, this is what the sentence will be if you execute a child. Or if you kill two people. Or, in this case, three. Now, unfortunately for this court, we have had two cases now where there were three victims. Three. Not two, but three. And this case, as Justice Gordon has pointed out, and some of the things that Justice Burke has pointed out, is the facts are particularly horrific here. Not to mention that you have an 11-year-old child. But each victim was stabbed multiple times with a small knife so that the court who heard this acknowledged how depraved the acts were. And in his findings, I think the court did consider, at least he reviewed everything. And, of course, he was constrained. But there is certainly a suggestion there that if he had discretion, he probably would have imposed this sentence. Now, the judge in Ybarra actually did that. And Ybarra was another case involving three young children. They were kids in an alley that were shot. So, I mean, are there any cases where there's three victims that, you know, any case that would say? Not that I'm aware of. But, you know, as to your point about the legislature, the legislature is just as constrained by the Illinois Proportionate Penalties Clause of the Constitution as this court is. And, you know, that portion of the Illinois Proportionate Penalties Clause that talks about the objective of restoring an offender to useful citizenship, there are special considerations when you have young offenders whose minds have not been fully formed yet. We know that that has implications for how much moral culpability you assign. And we know that it has implications certainly for rehabilitative capacity. You know, it may be the case with fully mature adults that certain offenses are so serious that they outweigh any rehabilitative objectives. But with young offenders whose minds are still developing, and we now know that an 18- or 19-year-old developmentally is much more similar to the same place as a 16- or 17-year-old rather than a mature adult. So, you know, a sentence imposed without consideration for any of that, the way that youth impacts rehabilitative potential and moral culpability, it just doesn't even consider any of that. It just empties meaning from the objective of restoring an offender to useful citizenship. Were there any other questions from the Court? No, I won't. You can reserve some minutes for rebuttal. Okay, thank you. Thank you, Ms. Benjawi. Mr. Levitsky. Good morning, and may it please the Court. Defending in this case was the principal and sole actor when he chose to arm himself with his pocketknife to confront his girlfriend, to kill her, to them, and then I know the Court is aware of these facts. Mr. Levitsky, does that give you any cause that he had a BCX, which found him bipolar, after trial? For two reasons it doesn't. First, we do know from the jailhouse informant that they talked about possibly malingering in a possible insanity defense, and also when we're looking at the sentencing hearing that the defendant got in this case, the Court was aware of all of that, knew from the PSI as well as from letters which were submitted in mitigation from the defendant's family about his psychological problems, and still, as this Court recognized, found that the defendant was more than deserving of the sentence that he received. Well, if he did really suffer from a mental, serious mental disease, would we be talking about the same thing here? If he did, then I think we would have to ask whether or not a serious mental disease, how a serious mental disease fits into the evolving signs of juvenile maturity, which, and I think that if you have someone with a serious mental disease, then that is something that can impact them irrespective of their age. It really wasn't fully developed in this brief, was it? It's more an issue about whether or not evolving standards would show that this particular usable offender doesn't have the development, say, that a 30-year-old would have or the person who's been convicted of multiple offenses. Sure, and I think that might speak to the insight that our Supreme Court gave us in Thompson, where the record didn't contain anything showing how the science of the evolving standards, or the evolving signs of juvenile maturity applied to that particular defendant. Here we have a defendant who also never made any argument that he was immature or he was impulsive, rather what we have here is a record where the facts of the offense themselves demonstrate that this wasn't impulsive or rash or immature, but when the defendant chose to enter that home to find another victim, it showed that he was acting with predation, and that is what prompted the court in this case. It was facing a situation of what all parties recognized was a mandatory life sentence. Didn't have to say anything, but the court nevertheless recognized and put on the record that this was an offense which demonstrated the depth and the breadth and the darkness of this defendant's heart. There had been a prior incident of domestic abuse, had there not, in this case? Yes, I believe there was some evidence of that. But wasn't there testimony about it? Right. A trial? Yes. What about that Supreme Court case that they took, the one that said that the – counsel referred to it? Right. Has there been an argument on that case yet? Damien Harris? Yes. So I understand that the reply brief is anticipated to be filed in April, and they're anticipating oral arguments to be scheduled in May. And what about Gibbs – is that no longer pending? Yes. I apologize that I don't know about the status of that. I thought that was one of the cases that was taken, but I could be wrong. Right. However, I would argue in response to the defendant's argument that his sentence in this case was constitutional under the Eighth Amendment as well as a proportionate penalties clause. And I believe that this case is squarely close to this division's holding in Ibarra, which, again, involved an individual who was over the age of 18 who was the principal offender in that case who also killed three people. And it's notable that when Ibarra committed that offense, he did so by pulling a trigger, but the defendant in this case used a knife. Well, you know, that one, the PLA was denied. Now, that has absolutely no precedential value of any kind. We know that. But the Illinois Supreme Court did not accept that case. Correct. And I would also note in response to the defendant's reliance on House that as this Court distinguished in Ibarra, House was a case which involved on the one hand the rule of legal accountability as well as the multiple murder rule. And the distinction that this Court noted in Ibarra extends back to Leigh Ann Miller of merely accountable versus the principal and sole offender. And in this case, defendant can't rely on that reasoning and that insight to these circumstances where he himself was the individual who committed these horrific offenses. And we should also point out that House is still up there. It hasn't been granted. It hasn't been denied. But it's still in the Supreme Court. So we don't know what's going to happen. Right. I would also just ask to, again, mention that the sentencing court in this case did have, without the benefit of any argument or evidence below, about how the evolving science of juvenile maturity applies to this defendant. But he did nevertheless allow each side to make argument. He allowed each side to present evidence. Defendant, in fact, did present evidence in mitigation in the form of three letters from his family. The court, again, considered the pre-sentence investigation, considered all of the arguments and the evidence that was submitted by both parties. So even though this was, as all parties acknowledged, a mandatory sentence, the judge nevertheless still considered all of the factors which defendant now relies on to demonstrate some evidence of his juvenile characteristics and nevertheless found that defendant more than deserved a natural life sentence. So even if defendant were to be resentenced on this record, the court would have rendered the same sentence even if it was discretionary. And so defendant cannot meet his strong burden to overcome the presumption of constitutionality of the sentence that he received. But if there are no further questions from this court, we would ask for those reasons and the reasons stated in our brief that this court affirm defendant's sentence. Thank you, Mr. Levitsky. Ms. Punjabi, brief rebuttal. Thank you, Your Honor. Counsel pointed out that defense counsel below didn't make Miller-type arguments, but the court had stated it would explicitly refuse to find that line of cases applicable, whereas in Yabara, I believe defense counsel made Miller-type arguments and argued that the law should be extended, Miller should be extended to this type of case. And the court actually made a finding that, look, I'm going to entertain that argument and I'm going to consider it. And even if the law were to be extended in the way that you're saying, in my discretion would still impose the same sentence. And we don't really have that here. I mean, yes, the court had some very harsh words about this very serious offense, but he really only considered the offense and not the offender. And to the extent that he did have the PSI in front of him and he did have the letters of mitigation, he didn't consider it through the lens of Miller. In one of this court's decisions, and I think it was Nieto, the court had pointed out it's not enough to consider the chronological fact of age and a young offender's background, but it must be considered through a Miller lens, meaning with the understanding that a person whose mind is not yet fully formed may have lessened moral culpability, may have increased rehabilitative potential. We have someone here who one can imagine that he's repeating patterns of violence he was exposed to in his formative years. These are the kinds of things Miller insists should be considered in sentencing a youth. And, you know, it may be that what's really shocking about this sentence is the mandatory nature. It may be that the judge, you remand it and he has a hearing and looks at all of these things and has a detailed hearing about this young person's background and still decides to, in his discretion, impose the same sentence. But does it, you know, this court has to decide whether it was fair and decent to deny that individualized hearing where you have his age, his troubled background, we have some things here on the record that deserved further scrutiny, the patterns of abuse, the abandonment, the mental illness. Does it offend our notions of fairness and decency to say that none of that should have even been considered by the judge in sentencing this teenage defendant? The judge should at least have been required to look at the full picture of this young person's background before deciding whether to impose the harshest sentence available in the state of Illinois. Thank you, Ms. Boncillo. Thank you. Okay, the matter will be taken under advisement. We'll issue an order as soon as possible.